Nott, J.
delivered the opinion of the Court.
This bill was originally filed by John J. Myers alone, and all the other parties, as appears by the title of the bill, were made defendants. But in the progress of the case William Myers and Robert Clendinen and Wife have, in fact, as they were originally, in interest, become joint complainants with John J. Myers. Whenever, therefore, I speak of the complainants, I wish to be understood as embracing them all, except where it shall appear that some one has a d’stinct interest from the test.
The case having once before been heard by this Court, at which hearing most of the questions of law by which it must be governed were settled, little is now left to be done, except to inquire whether the. Chancellor has mistaken the evidence, or drawn incorrect conclusions from it. But that is a matter of no small difficulty, with such a mass of testimony, embracing the transactions of upwards of twenty years, and embarrassed by the conflicting opinions of such a -fcumbej: of vyitnesses.
*27 The first question which I shall consider, is that presented by the first ground relied on by the defendant, and which relates to the note of hand setup by him against his father’s estate. This question has undergone a laborious investigation by the commissioner, and the testimony has been actually examined by the Chancellor ; and both have come to the conclusion that the claim ought to be rejected. Under these circumstance the Court would not reverse the decree, unless some palpable error could be brought to our view. But none such can be discerned. On the contrary, a great variety of circumstances combine to dead us to the same conclusion. The appearance of the paper, on which the note is written, is almost sufficient to pronounce its condemnation. To see a note drawn for upwards of six thousand dollars on a slip of paper, on which a person would hesitate to give a draft for a yard of tape, cannot fail to excite a suspicion, that it was unfairly obtained, or intended for some temporary purpose, which must have, been answei ed in the lifetime of tie testator. Indeed there is reason to believe, from a variety of circumstances, that there was a secret transaction'between the parties to which this note was intended to give co'our; and that it was never intended to be carried into execution. In tbe will of the defendant’s testator he savs he does not know that he owes any debts. Now it cannot be believed that a person of limited property could forget a debt of such magnitude ; and although his declaration may not he received as evidence of the fact, yet such an inference may well be drawn from the acquiescence of the supposed creditor, on -whom the execution of the will devolved, and who has not, during an administration of twenty years, given any intimation to the contrary. It is true, as has been urged in the argument, that in making out an inventory of an estate the debts due hy the deceased are not required to lie inserted. But an annual account nf the administration, including the debts and credits, is required, which has been entirely neglected. This remissness has been attempted to be accounted for by the belief of the defendant, that all his children were intitled to the benefit of their grandfather’s bounty; and a confidence on his part, that they would be satisfied with the provision which he would make for them, and not subject him to the rigorous account which is now exacted. It is possible that there may be some truth. in the suggestion, But even if it be so, it is the mis» *28 forcune 0f the defendant, that he must suffer for his misplaced coli- .' ... fidence, and not the fault of this Court. His chüdien impute to him different motives, and the Court cannot undertake to determine whose fault it is, that such an unnatural war has been waged. And if we have not been able to ascertain the truth, the difficulty has been enhanced, if not created, by the defendant’s own neglect, and he must take the consequences of it. It is the opinion of the Court that this part of the decree must he affirmed.
The next question which I shall consider is the hire of the slaves. The commissioner has allowed seventy dollars per annum. That, it appears, is the highest estimate made by any of the witnesses, whose opinions have been taken, and double the amount which in the opinion of others ought to be allowed. The commissioner seems to have been governed by some observations made by the Court, in this same case on the former trial, wherein it was said, that the defendant’s refusing to account furnishes a very good reason, why the Court should adopt the most rigid rule of calculation, which the law affords in behalf of the cesbuy que trusts. Bat the Court in making that observation was merely laying down a general principle, to be applied to cases according to circumstances, without intending to express an opinion as to its application to this case ; and the circumstances of the case do not appear to make it our duty to subject the defendant to such a penalty. On the contrary, the lowest calculation which has been made, affords the complainants a profit on the capital employed, equal at least to any thing that could have been contemplated. The Chancellor has i educed the sum to fifty dollars per annum for each slave; and if we were to judge alone from the testimony of the witnesses, I do not know that we could be dissatisfied with the decree. For the witnesses differed so much in opinion, that any conclusion drawnfrom their testimony must be in a great measure conjectural. It was a general rule, formerly, in the Court of Equity, to allow ten pounds, sterling, which is between forty-two and foity-three dollars for the annual labour of a slave. But since the introduction of the culture of cotton that rule has been abandoned, and certainly ought not to be resorted to for any short period of service, where the value the .labour can be ascertained by more certain evidence, But it must be recollected that this claim commenced during the operation of *29 that rule : and that several eventful periods of our history, which . . . . . have had no little influence on the agricultural prosperity of this country, have occurred since that time. The defendant has had the calamities of embargoes, war, and inundations, to encounter. Under such embarrassments and with the difficulty of ascertaining with any thing like precision the amount of crops, and fluctuations of prices, for such a length of time, the Court has- thought it better to abide by an established rule, although subject to some objections, than to adopt a sum which must in all probability be still more arbitrary. And we are the more inclined to adopt this rule from the result of the calculation, which produces an amount- exceeding any thing that, we think, could have been anticipated from the capital employed. The Court therefore is of opinion that no injustice is done to the complainants by reforming the decree in that respect.
The next question relates to the interest. On that subject the opinion of this Court has been fully expressed in the cases of Black v. Blakely, 2 M’C. Ch. 1, and Wright v. Wright, Ib. 185; and we are still satisfied with the views there expressed on the subject. Whether compound interest ought ever to be allowed on the profits of trade, or the labour of slaves, is at least questionable. It is usually allowed in lieu of and as a substitute for such profits ; and in some cases is most justly allowed. The profits of trade are usually considered as equal to compound interest on the capital; and in the case of slaves, the value of the labour with simple interest upon the appraised value of the capital, as is actually the case in this instance. In addition to this an increase of capital may usually be calculated on, to treble the amount of the original, by the increase, of the slaves. And if the result has been otherwise in this instance, it must be imputed to.accidental causes, as no allegation ofilltreatment is made against the defendant. We have been furnished with the case of Henderson v. Laurens decided in the former Court of Appeals, which was not known to this Court when the cases above referred to were decided, in which the question of compound interest was very fully considered : and it is very gratifying to find that the investigations of the two Courts have lead to the same conclusion. I shall now be satisfied with referring to that case, as expressing the views of this Court, if any further expression of them is necessary. With regard to the practice of the -English *30 Courts I would remark that the legal interest of that country is five per cent; but influenced perhaps by the bank discounts, and usual government interest, I believe the current'interest of the c°tlntry is only four per cent: and this is the usual rate allowed by the Courts. But in cases of neglect, or where there has been a want of good faith, five per cent is required; so that in most cases, even when something like a penalty for such delinquencies is intended, the lawful rate of interest is thought sufficient. In very special cases however compound interest is required, as in the case of Raphael v. Boehm, 11 Ves. 108, and that calculated with semi-annual rests. The Court is therefore satisfied with that part of the decree.
With regai d to the Gut, and Bl-uff lands, the Court is of opininion that the Chancellor was correct in directing an issue to try the title. But the defendant ought not to be divested of the possession until the right is determined. That part of the decree directing a surrender of those lands must be reversed.
The Court is not disposed to interfere with that pai’t of the decree which relates to the ’improvements made upon the land. For although it may be somewhat ambiguous in some of its parts, yet when we look into the evidence, and into the various opinions of the witnesses on the subject, and the critical and laborious examination which the case has undergone, we have no reason to believe that another investigation would lead us nearer to the truth. The experience of every day teaches me, that the delay and expences of a tedious law suit are among the greatest evils that a person can suffer in this country. And I do not believe that we can do gt eater justice to the parties in this case, than to close, with all jjossible despatch, the scene'of litigation in which they aie engaged.
As to the property given to Mr. Clendinen at the time of his marriage, the Court, is satisfied with the decree. For whatever might have been the legal presumption in such a case, the parties had a right to make their own terms. And although the evidence on this point, as on almost every point in the case, was somewhat contradictory, yet there was enough to authorize the conclusion at which the Chancellor has arrived. lie had the express declaration of the complainant that the property was received in payment, and not as an advancement of defendant’s daughter in marriage. And *31 although there were expressions of the defendant to the contrary, which went equally to weaken his claim; yet some conclusion must be drawn from the testimony, notwithstanding these contending declarations of the parties. Perhaps the unexecuted paper, signed by the complainant, ought of itself to be sufficient to turn the scale against him. It was a more deliberate act, and therefore entitled to more consideration than any loose verbal declaration ; and although it was never completed, so as to become a binding contract, yet it cannot but be considered as going a great way towards expressing the complainant’s own views of the matter. That part of the decree must therefore remain undisturbed.
The most important part of the case is that in relation to the settlement ordered to be made on Mrs. Clendinen. It seems to be now a settled rule of equity in England, that where a husband applies to a Court of Equity for property belonging to the wife, the Court will lend its aid on no other terms, than that he shall make suitable provision for the wife, out of the property so recovered, unless a sufficient provision has been already made. There are some qualifications to the rule, which it is not necessary to notice, as they do not affect the general principle. The same rule has been adopted in this State, and I believe in all the States in the Union where Courts of Equity are established, and the question cannot now be regarded as open for discussion. 1 Mad. Ch. 482, Oxenden v. Oxenden, 2 Vern. 493, Langham v. Nenny, 3 Ves, 469, Milner v. Colmer, 2 P. Wms. 641, Glaister v. Hewer, 8 Ves. 196, Murray v. Lord Elibank, 10 Ves. 85, 2 Kent’s Com. 116, 119, Taylor v. Mayrant, 4 Desaus. 505, Durr v. Bowyer, 2 M’C. Ch. 368.
But the great question is, whether the Court will, ex officio, withhold the property or money, from the husband, until a setlement is made, without any application on the part of the wife; or whether it is only on such application that a settlement will be required. Mr. Maddock says, “ the habit of the Court has ahvays been, of itself, and without any application previously made by the married woman, to direct an inquiry, where money has been carried over to her account, whether any settlement has been made adequate tothefortune she then possessed.” 1 Mad. Ch. 486. The cases referred to in support of this position are Lady Elibank v. Montolieu, 5 Ves. 737, and March v. Head, 3 Atk. 720; but in- both these cases the appli *32 cation was by the wife against the husband, for the purpose of procuring a provision to be made for her. In the case of Durr v. Bowyer, 2 M’C. Ch. 368, the application was made by the defendant, Bowyer, on behalf of the wife, but without any authority from her ; and from some expressions which fell from the Court, it would appear, that such an application would be regarded by the Court as sufficient. But the case went off on other grounds, and that question therefore cannot be considered as decided. A settlement, certainly will not be ordered against the wishes of the wife. Willats v. Cay, 2 Atk. 67, Milner v. Colmer, 2 P. Wms. 638, Murray v. Lord Elibank, 13 Ves. 1. It is true thatin the case of Bourdillon v. Adair, 3 Bro. C. C. 237, Lord Thurlow refused where the wife was abroad, to order a legacy to the wife to be paid to the husband, without the consent of the wife taken by commission; and this goes a great way towards supporting the doctrine in Durr v. Bowyer. But although Lord Thurlow would not order the money to be paid to the husband, he did not order it to be 'settled on the wife; but declined acting until her'' wishes could be ascertained : and in the case of Glaisterv. Hewer, 8 Ves. 206, Lord Eldon said, that there was no instance of a debtor calling upon the Court to interpose the equity for the wife. The same observation I presume will apply to any stranger. Kenny v. Udal, 5 Johns. Ch. R. 464. The application must be made by the wife herself, or her guardian, or attorney, or by some one standing in a similar relation to her : and in Durr v. Bowyer, the Court did not say, that the money should be settled on the wife, but merely that it should not be paid to the husband without her consent. Upon a comparison therefore of all the cases, I am of opinion, that the rule ought tobe, that the Court will not order a settlement for the benefit of the wife, upon the application of a stranger, without the consent of the husband : neither will it order the property to be transferred to the husband until the wife has been consulted ; but will merely direct an inquiry to be made, whether any, and' what, provision has already been made for the wife, and whether she will consent that it shall be paid to the husband.
In the present case, the Court is of opinion, that the Chancellor ■ought not, ex officio, to have ordered a settlement to be made of Mrs. Clendinen’s share of the estate, without an inquiry as to whe *33 ther she desired it, and whether any provision had already been made for her; but as the Chancellor has made such order at the request of her father, the Court will not rescind it until such inquiry has been made. It is therefore referred to the commissioner to ascertain, and report to the Circuit Court, whether any, and what, provision has been made for Mrs. Clendinen, and also what are her wishes in relation to a settlement, and the nomination of a trustee, if an order for a settlement should become necessary.
Several other questions growing out of the evidence were submitted to the Court"; but in a case like the present, for this Court to attempt a detailed examination of the accounts would be as embarrassing as it would be fruitless. And we cannot too often impress it upon parties, and their counsel, that these matters must be settled in the Court below, and that like the verdict of a jury upon matters of fact, the decree of the Chancellor must be final and conclusive, unless some specific error can be pointed out, on which the party can lay his finger, so as to render it at once visible to the Court.
The decree must therefore be reformed, so as to meet the views here expressed, and in all other respects it is affirmed.

Decree modified.